<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH CACCIATORE, STEVEN BOJEKIAN, JAMES HAGUE, and HENRY SONDEJ | Civ. No. 02-1404(WGB) |
| Plaintiffs, | **M E M O R A N D U M** |
| vs. | **O P I N I O N** |
| COUNTY OF BERGEN, and, BERGEN COUNTY SHERIFF'S OFFICE, JOSEPH CICCONE, individually and in his capacity as Sheriff of Bergen County, and FRANK BENDETTO, individually and in his official capacity as a captain in the Bergen County Sheriff's office, MICHAEL BRADLEY, individually and in his capacity as a Lieutenant in the Bergen County Sheriff's Office, and JOHN DOES 1-10 (who are unidentified Bergen County Employees), | |
| Defendants. | |

<u>APPEARANCES:</u>

John A. Stone, Esq.
EDWARDS & CALDWELL LLC
1600 Route 208 North
P.O. Box 23
Hawthorne, NJ 07507

    Attorneys for Defendants County of Bergen
    and Bergen County Sheriff's Department

John J. Robertelli, Esq.
Jenniene M. Saracino, Esq.
JOHN J. ROBERTELLI
46 Clinton Place
Hackensack, NJ 07601

    Attorneys for Defendants Frank Bendetto and
    Michael Bradley

Douglas V. Sanchez, Esq.

David L. Blank, Esq.
BEATTIE PADOVANO, LLC
50 Chesnut Ridge Road
Montvale, NJ 07645

    Attorneys for Defendant Joseph Ciccone

Beverly M. Wurth, Esq.
CALO AGOSTINO, P.C.
14 Washington Place
Hackensack, NJ 07601

    Attorneys for Plaintiffs

**BASSLER, SENIOR DISTRICT JUDGE:**

    Plaintiffs Joseph Cacciatore, Steven Bojekian, James Hague and Henry Sondej filed a six-count complaint against Defendants County of Bergen, the Bergen County Sheriff's Office ("County"), and Joseph Ciccone, Frank Bendetto and Michael Bradley ("Individual Defendants"), in their individual and official capacities as employees of the Bergen County Sheriff's Department (collectively "Defendants").[1]  Plaintiffs claim that Defendants

---

[1] Plaintiffs, however, have agreed to dismiss Count 2, which alleges deprivation of their liberty and property interest in violation of 42 U.S.C. § 1983, the part of Count 4, which alleges a violation of the New Jersey's Wage and Hour Act and Count 6 alleging intentional infliction of emotional distress.  Four counts of Plaintiffs complaint remain alleging violations of: (1) plaintiffs' constitutional rights of free speech and association under the First and Fourteenth Amendments, (2) plaintiffs' employment rights under N.J.S.A. 11:1-1 et. seq., N.J.S.A. 40A:9-1 et. seq., N.J.S.A. 40A:14-1 et. seq., (3) Fair Labor Standards Act, 29 U.S.C. § 201, and (4) N.J.S.A. 10:5-12 by discriminating against Plaintiff Sondej.  Furthermore, as no further mention has been made of Plaintiffs' § 1985 claim, Plaintiffs have apparently abandoned that claim.  D'Angio v. Borough of Nescopeck, 34 F. Supp. 2d 256 (M.D. Pa. 1999) (plaintiff's failure to address claim in opposition brief amounted to waiver of that claim).

2

retaliated against Plaintiffs when they refused to support Ciccone's political campaign for sheriff violating plaintiffs' Constitutional and statutory rights.  Plaintiffs assert that "failure to abide by the rules of political patronage resulted in loss of overtime, [dis]favored assignments, transfers, and constructive demotion in the form of failure to promote." Plaintiffs' Memorandum of Law ("Pls. Mem.") at 5.

## I.  FACTUAL BACKGROUND[2]

Defendant Ciccone was elected sheriff of the Bergen County Sheriff's Office in November 1998.  He was sworn into office on January 1, 1999 and left office on January 11, 2001.  Defendant Bradley is a Lieutenant of the Bergen County Sheriff's Office and has been a Lieutenant since 1999.  Defendant Bendetto also was a member of the Bergen Sheriff's Office.  He held the rank of Captain during Ciccone's tenure and was appointed by Ciccone to the rank of deputy chief.  Plaintiffs also were employees of the Bergen County Sheriff's Office during Ciccone's term.  Plaintiffs allege that they were pressured to purchase tickets for Ciccone's political fundraisers and faced retaliation for failing to comply with Defendants' demands.

### Joseph Cacciatore

---

[2]All facts have been construed in the light most favorable to Plaintiffs, the nonmoving party.  Boyle v. Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998).

Cacciatore has been in law enforcement since 1982. (March 1, 2004, Cacciatore Dep., Ex. F, Stone Aff., 8:14-19). When Ciccone became sheriff, Cacciatore was a detective sergeant. Soon after Ciccone was hired, Cacciatore was approached to purchase tickets for a Ciccone fundraiser, which he purchased for $300. (Id. at 22:1-24:12). Subsequently, Cacciatore claims that he was forced to buy tickets on a monthly basis. (Id. at 23:13-24:24).

Cacciatore was transferred five times between January 1999 and June 2000, at Bendetto's request (Id. at 12:19-23). He claims that he was told directly by Ciccone that if Cacciatore wanted to go back to the detective's bureau he had to support Ciccone's cause. Ciccone also informed him that Cacciatore had to go to Ciccone's functions and be a part of the team. Ciccone further requested that Cacciatore go to Ciccone's office after hours and inform him of what other people were doing. (Id. at 24:35-35:11). Cacciatore alleges that he was told by James McLarnon, Frank Bendetto, and an officer named Darrel that he had to buy tickets. (Id. at 27:4-29:11). Cacciatore would receive as many as 50 tickets for purchase. (Id. at 30:10-17).

Cacciatore claims that in late 2000 after he told Bendetto that he would not buy anymore tickets, his car and his on-call pay were taken away from him and he was immediately transferred. Bendetto allegedly told Cacciatore that "you will never learn."

4

(Id. at 30:18-31:17).  After Cacciatore complained to Bendetto about having to sell tickets, Bendetto purportedly wrote a letter to Wayne Yahm stating that Cacciatore could not work overtime unless he received Bendetto's approval.  (Id. at 48:18-49:22).  Cacciatore asserts that he also lost his differential pay for having to work a different shift when he was transferred.  (Id. at 102:22-103:20).

Cacciatore complained to the presidents of the Policeman's Benevolent Association ("PBA") but was afraid to file a formal grievance (Id. at 53:12-23).  He wrote two anonymous letters to the department of personnel voicing his complaints (Id. at 58:18-21).

**Steven Bojekian**

Bojekian has been employed at the Bergen County Sheriff's Office since August 1978.  (March 8, 2004, Bojekian Dep., Ex. C, Stone Aff., 18:4-6).  After he transferred from being a correction officer to working in the sheriff's office, he was promoted to sergeant.  (Id. at 18:10-23).

When Ciccone became sheriff, Bojekian was assigned to the detective bureau and was responsible for the design and construction of the new Bureau of Criminal Identification ("BCI") building.  He was the primary liaison between the County of Bergen, the construction management firm and the architects for the project.  (Id. at 19:20-20:5).  Bojekian alleges that he was

removed from his position supervising the construction project after he made it clear to Ciccone's advisors that he was not interested in attending a dinner for Ciccone because Bojekian had a policy not to attend fund raising events. (Id. at 37:19-38:3). In addition, Bojekian believed that he was removed from his position because he refused to seek money for Ciccone's campaign from vendors. (Id. at 88:20-89:7).

Bojekian was assigned back in uniform to the court security division. Bojekian claims that instead of rotating through all the assignments in the courthouse as other sergeants did, he was assigned to the juvenile holding facility in the basement of the courthouse. (Id. at 22:11-21). Bendetto informed Bojekian that he was being transferred for the good of the company, and Lieutenant Weist told Bojekian that "between you and me, it's about Bendetto. They called me and told me to put you in juvenile." (Id. at 39:3-10).

Bojekian claims to have made a report to the PBA. A grievance was filed, but it was never acted upon. (Id. at 55:16-64:4). Bojekian did not receive overtime in the juvenile holding facility as he had overseeing the construction project. He also lost his vehicle and all stipends that he had received in the detective bureau. (Id. 27:19-28:20). Bojekian maintains that he did not receive promotions or transfers like others that supported Ciccone (Id. at 40:12-44:24). Even though Bojekian

6

ranked number 3 on the civil service exam, he was not promoted to Lieutenant. (Id. at 119:24-129:5). Bojekian remained in the juvenile holding facility until 72 hours after Ciccone was removed from his position as sheriff. (Id. at 23:2-23).

After Ciccone's departure, Bojekian was promoted to the rank of Lieutenant in 2001. (Id. at 18:10-23). In November 2001, Bojekian was appointed to the position of deputy chief. He is currently chief of the department, which he was promoted to in January 2002. (Id.)

### James Hague

Hague began his career in law enforcement in 1988 as a correction officer. (February 27, 2004, Hague Dep., Ex. K., Stone Aff., 9:5-10:23). When Ciccone became sheriff, Hague was a sheriff's officer assigned to the community policing unit. (Id. 11:2-18). He claims he was forced to hand out literature, flyers, banners and magnets on behalf of Ciccone. (Id. at 11:2-12:21)

Hague alleges that Ciccone personally called Hague into Ciccone's office and told Hague that an officer of his stature was a role model officer and had to attend his functions, after Hague did not purchase $250 tickets for a Ciccone gathering. (Id. at 21:2-23). When Hague also refused to purchase tickets from Chris Janiec, Janiec told him that it was a mistake and that "Hague would see when the transfer orders came out." (Id. at

21:16-22:17).  Ten days later, on June 10, 2000, Hague was transferred to the court security division, which Hague perceived as a "punishment post."  (Id.)  Hague contends that he also was removed from the DARE program, the sheriff's emergency response team, the entire special operations group and from other responsibilities.

Hague filed a grievance.  (Stone Aff., Ex. N).  Hague complained to PBA President Tony Fowler, who stated that he had been in touch with Lenny Kaiser to let the County Administration know what was going on at the sheriff's department (February 27, 2004, Hague Dep., Ex. K, Stone Aff., 36:20-37:5).  Hague claims that his overtime was reduced, that he did not receive honor guard detail, which provided overtime and that he lost stipends for the special assignments, which he was removed from, including DARE and the emergency response team.

### Henry Sondej

Sondej claims that shortly after Ciccone took office, Sondej was informed by Michael Bradley that "it would be in [Sondej's] best interest" to buy tickets to Ciccone's events.  Sondej further maintains that Bradley told him that he would lose his K-9 dog and be transferred to the jail if he did not buy tickets (May 25, 2004, Sondej Dep., Ex. M, Stone Aff., 14:13-16:24).  Sondej said that at one point, Bradley tried to force him to buy a whole table of tickets that were $150 each.  (Id. at 19:5-25).

Sondej stated he was also told to buy tickets from Bendetto once. (Id. at 21:12-17). Sondej claimed that according to Bradley, the orders to purchase tickets were coming directly from Ciccone. (Id. at 36:7-37:6). Finally, Sondej explained to Bradley that he could not buy any additional tickets. Sondej filed a grievance arguing that he was being forced to take compensatory time off instead of overtime and made verbal complaints to PBA Presidents. (Id. at 51:1-52:24; see also Ex. K; Wurth Aff.). He stated that he was being skipped over on the overtime list. (Id. At 99:21-100:18). Sondej claims that Bradley admitted that the reason his overtime was negatively affected was because Sondej "would not buy or sell tickets and was not going along with the program." (Id. at 105:10-106:2).

Sondej also asserted that Bradley made racial and demeaning remarks to Sondej. Sondej complained in writing that Bradley created a hostile work environment (Id. at 66:10-67:18).

## II.  MUNICIPAL LIABILITY

A plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal policy or custom that caused plaintiff's injury.  Natale v. Camden County Correctional Facility, 318 F.3d 575 (3d Cir. 2003). Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from "decisions of its duly constituted legislative body or of those officials whose acts may fairly be

said to be those of the municipality." Board of County
Commissioners of Bryan County v. Brown, 520 U.S. 397, 403-404
(1997) (emphasis added). Similarly, an act performed pursuant to
a "custom" that has not been formally approved by an appropriate
decision maker may fairly subject a municipality to liability on
the theory that "the relevant practice is so wide spread as to
have the force of law." Id. (emphasis added).

There are three situations where acts of a government
employee may be deemed to be the result of a policy or custom of
the governmental entity for whom the employee works, thereby
rendering the entity liable under § 1983. Natale, 318 F.3d at
584. The first is where "the appropriate officer or entity
promulgates a generally applicable statement of policy and the
subsequent act complained of is simply an implementation of that
policy." Id. (citing Bryan County, 520 U.S. at 417). The
second occurs where "no rule has been announced as policy but
federal law has been violated by an act of the policymaker
itself." Id. Lastly, a policy or custom may exist where "the
policymaker has failed to act affirmatively at all, [though] the
need to take some action to control the agents of the government
'is so obvious, and the inadequacy of existing practice so likely
to result in the violation of constitutional rights, that the
policymaker can reasonably be said to have been deliberately
indifferent.'" Id. at 417-18. Neither of these situations is

present.

First, Plaintiffs point to no express policy or edict by the County or any other Defendant to discriminate or retaliate against employees who refuse to contribute to the sheriff's campaign.  Second, Plaintiffs have failed to identify a policymaker, whose violative acts may render the County liable. In order to ascertain who is a policymaker, "a court must determine which official has final, <u>unreviewable</u> discretion to make a decision or take action."  <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1212, 1213 (3d Cir. 1996).  Plaintiffs put forth no evidence that Ciccone is a policymaker for the County.  Plaintiffs' conclusory statement that "there can be no argument but that Ciccone was the policymaker for the County defendants" is insufficient.[3]

"The fact that a particular official, even a policymaking official-has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."  <u>Pembauer v. City of Cincinnati</u>, 475 U.S. 469, 481-82 (1986).  The official also must be responsible for establishing "final government policy" with

---

[3]Although Defendants have the initial burden of proof, Defendants may satisfy their burden by showing that there is an absence of evidence to support Plaintiffs' case.  <u>Thornton v. City of Philadelphia</u>, No. Civ.A. 04-2536, 2005 WL 2716484, at *1 (E.D. Pa. 2005).  After Defendants have met their burden, Plaintiffs' response, by affidavits or otherwise as provided in the rule, must set forth specific facts showing that there is a genuine issue for trial.  <u>Id.</u>

regard to the activity at issue before the municipality can be held liable. <u>Id.</u> Plaintiffs rely solely on their statement that it is indisputable that Ciccone is a policymaker for the County to survive summary judgment. Plaintiffs, therefore, must assume that because Ciccone is a sheriff in the County, who has some policymaking authority, any policies that he creates in the sheriff's office are considered County policy. This conclusion is misguided. <u>See McMillan v. Monroe County Alabama</u>, 520 U.S. 781 (1997) (holding that sheriff was policymaker for the State of Alabama, not for the county); <u>cf.</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 484 (1986) (recognizing that County Sheriff and County Prosecutor could establish county policy regarding law enforcement practices).

Whether an official has final policymaking authority is a question of state law. Plaintiffs allege that Ciccone, with the assistance and cooperation of Defendants Benedetto and Bradley, instituted a policy of "extorting money from plaintiffs for Ciccone's political causes and activities under threat of transfer, demotion, loss of overtime and assignments." Complaint ("Compl.") ¶ 25. It is clear under New Jersey law that the Sheriff has the authority to make employment decisions in his office, including hiring, firing and promoting employees. N.J.S.A. 40A:9-117 (sheriff "shall select and employ the necessary deputies, chief clerks and other personnel"); <u>see also</u>

<u>Prunetti v. Mercer County Bd. of Chosen Freeholders</u>, 350 N.J. Super 72 (2002)(recognizing sheriff's authority to hire, fire or discipline employees).  The Sheriff's power pertaining to employees, however, is not beyond review.

In <u>In re Burlington County Board of Chosen Freeholders</u>, 188 N.J. Super. 343, 352 (1983), the court ruled in favor of the County Board of Freeholders who argued that in situations involving "*their* employees, paid with *their* monies," the Board has the power to investigate the sheriff involving allegations of the mismanagement and abuse of personnel.  The sheriff was accused of using his officers for private purposes, discriminating against his employees and suspending employees without cause, amongst other things.  The court stated that it is "entirely clear that the Legislature controls the duties of the sheriff and the activities of his office."  <u>Id.</u> at 348.  The court further held that the sheriff acts as the "agent" of the county in hiring his personnel, and that although N.J.S.A. 40A:9-117 gives him the authority to select and employ all personnel, their compensation must be recommended by the sheriff to the board of freeholders.  <u>Id.</u> at 350; <u>see</u> <u>also</u> May 18, 2004, Ciccone Dep., Ex. J, Stone Aff., 9:17-19 ("County personnel would be advised of any promotion or any assignment that had a financial change status").

Although the Defendants argue throughout their briefs that

13

Plaintiffs' base salary did not change (see e.g. Ciccone
Memorandum of Law ("Ciccone Mem.") at 7), Plaintiffs maintain
that Defendants effectively have decreased Plaintiffs'
compensation by transferring them into positions where they do
not receive overtime, refusing to offer overtime and forcing them
to take compensatory time in lieu of overtime because Plaintiffs
refused to provide campaign contributions.  The Court finds that
the Sheriff's employment decisions regarding these matters are
not "final and unreviewable" to make him a policymaker for the
County.

Lastly, Plaintiffs fail to establish that the County acted
with deliberate indifference.  Unlike the Natale case (318 F.3d
at 575), there is insufficient evidence to show that the County
Defendants turned a "blind eye to obviously inadequate
practices."  See also Pls. Mem. at 5.  Again, Plaintiffs make a
bare assertion that there is sufficient proof of "a history and
custom . . . during numerous prior administrations of demanding
political patronage from members of the Sheriff's department."
Id.  Yet, Plaintiffs do not contend that they were also
transferred and denied overtime for not contributing to political
campaigns prior to Ciccone's tenure.

The only evidence the Court could find to even remotely
suggest that the County Defendants should have been aware of
Defendants' conduct is Bojekian's claim that he "ran into Pat

14

Schuber, the County Executive, who purportedly stated "we know
what is going on" and Hague's claim that PBA President Tony
Fowler told him that he had been in touch with Lenny Kaiser, also
employed by the county executive office, to tell him what was
going on with the sheriff's department.  (March 12, 2004,
Bojekian Dep., Ex. E., Stone Aff., 39:21-40:8; February 27, 2004,
Hague Dep., Ex. K, Stone Aff, 36:20-37:5).  This evidence is
insufficient to show that the County knew or should have known
that Ciccone allegedly was requiring officers to contribute to
his campaign or suffer employment repercussions.[4]

Plaintiffs have not provided any state case law in support
of its position that the municipality is liable for its state
claims.  Plaintiffs' municipal liability argument relies solely
on § 1983 case law.  Therefore, the Court finds that the County
Defendants cannot be held liable for the state law claims under
Plaintiffs' asserted theories.  See Roskos v. Sugarloaf Township,
295 F. Supp. 2d 480 (M.D. Penn. 2003).

## III.  PLAINTIFFS' CLAIMS AGAINST INDIVIDUAL DEFENDANTS

### A.   § 1983 Claim

In order to establish a § 1983 claim, a plaintiff "must

---

[4]The Court further finds that it would serve a great
injustice for the County to be found liable for an act that its
Prosecutor, along with the Attorney General, investigated and
prosecuted.  Instead of showing that the County was deliberately
indifferent, it shows that the County will not tolerate the
sheriff's alleged misconduct.

demonstrate a violation of a right secured by the Constitution
and the laws of the United States [and] that the alleged
deprivation was committed by a person acting under color of state
law." Kneipp, 95 F.3d at 1204.  Plaintiffs claim that Defendants
violated their First and Fourteenth Amendment rights to "free
speech and association."  Compl. ¶ 28.  In order to establish a
prima facie case of a First Amendment violation a plaintiff must
prove: (1) that the conduct was "constitutionally-protected"; and
2) that the conduct was a "substantial factor" or a "motivating
factor" in the allegedly adverse employment decision.  Mt.
Healthy City School District Bd. of Educ. V. Doyle, 429 U.S. 274,
287 (1977).

    The case law supports Plaintiffs' contention that the speech
and political association at issue here–refusing to purchase
tickets and to support Ciccone's political campaign–are
constitutionally protected.  Sykes v. McDowell, 786 F.2d 1098,
1104 (11th Cir. 1986)(ruling that deputy engaged in protected
speech by refusing to support the sheriff); see also Brown v.
Reardon, 770 F.2d 896, 903 (10th Cir. 1985) (suggesting that
plaintiffs could prove that deciding not to buy tickets to a
fundraiser could be protected speech); Motto v. City of Union
City,  No. Civ. A. 95-5678, 1997 WL 816509, at *13 (D.N.J. August
27, 1997) (same).

    The Court also finds that Plaintiffs have created a material

16

issue of genuine fact regarding whether a "motivating or substantial factor" in Defendants' decisions to transfer, refuse to promote, or deny overtime was their failure to purchase tickets or contribute to Ciccone's campaign fund. <u>Brown</u>, 770 F.2d at 896. Bojekian testified that he was removed from the construction project after stating that he would not purchase tickets to Ciccone's campaign fund. <u>See</u> <u>supra</u> 5-6. Both Cacciatore and Hague claim that they were transferred after refusing to purchase tickets. <u>supra</u> 4,8. Similarly, Sondej claims that he was denied overtime and forced to take compensatory time in lieu of overtime after he ceased purchasing tickets. <u>supra</u> 9.

**B. Fair Labor Standards Act**

At this juncture of the case, the Court is not convinced that the evidence provided precludes relief under the Fair Labor Standards Act ("FLSA"). Therefore, the Court refuses to grant summary judgment on Plaintiffs' FLSA claim.

**C. Law Against Discrimination**

The Law Against Discrimination ("LAD") prohibits discrimination "because of race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for service in the Armed Forces of the United States or Nationality." <u>Taylor v. Metzger</u>, 152 N.J. 490 (1998) (citing N.J.S.A. 10:5-3). In assessing

17

discrimination claims under the LAD, the court employs a three-step, burden shifting analysis developed under the federal anti-discrimination laws:

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination;
> (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and
> (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.

Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 69 (App. Div. 2004) (citing N.J.S.A. 10:5-1, et seq.).  In the absence of direct evidence of discrimination the court follows the McDonell Douglas structure, which requires a plaintiff to prove that (1) she is a member of a protected class, (2) she was qualified for the job and (3) she was negatively affected by the defendant's employment decisions and (4) she was treated less favorably than employees not within the protected class.  Sondej is a member of a protected class and claims that he was treated differently from his counterparts by being skipped over on overtime list, not receiving overtime he had worked for and being required to take compensatory time instead of overtime.  (May 25, 2004, Sondej Dep., Ex. M, Stone Aff., 66:10, 99:21, 105:10-106:2).

In reviewing a claim for hostile work environment, the Court considers the totality of the circumstances.  Lehmann, 132 N.J. 587, 607 (1993).  Conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and

18

create an abusive working environment." Id. at 608. In general,
a "hostile work environment discrimination claim cannot be
established by epithets or comments which are 'merely
offensive.'" Mandel, 373 N.J. Super. at 73. "Discourtesy or
rudeness should not be confused with racial [or ethnic]
harassment," and a "lack of racial [or ethnic] sensitivity does
not alone, amount to actionable harassment." Id. Therefore,
simple teasing, offhand comments and isolated incidents (unless
extremely serious) will not amount to discriminatory changes in
the "terms and conditions of employment." Id.

Nevertheless, a single utterance of an epithet can, under
certain circumstances, create a hostile work environment.
Taylor, 152 N.J. at 501. In Taylor, the New Jersey Supreme Court
precluded summary judgment where a material issue of fact existed
as to whether a single racial epithet uttered by a sheriff was
sufficiently severe to have created a hostile work environment.
The Court held that the severity of the remark was exacerbated by
the fact that the comment was stated by a supervisor or superior
officer. The Court noted that a supervisor has a unique role in
shaping the work environment. Part of a supervisor's
responsibilities is the "duty to prevent, avoid, and rectify
invidious harassment" in the workplace. Id. at 503. Here,
Sondej's letters of September 13, 2000 and October 4, 2000 are
sufficient evidence to create a material issue of fact regarding

19

whether Defendant Bradley, Sondej's supervisor, created a hostile work environment by calling him names like "polak," "turnkey" and "greenhorn". (Wurth Aff., Ex. K-L; <u>see</u> <u>also</u> May 25, 2004, Sondej Dep., Ex. M, Stone Aff.,156:13-21). Therefore, summary judgment on Plaintiffs' LAD claim is denied.

## IV.  INDIVIDUAL DEFENDANTS' DEFENSES

### A.  Qualified Immunity Defense

Defendants Ciccone, Bradley and Bendetto claim that they cannot be held liable for violating any law because they are entitled to qualified immunity.  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  A factfinder could conclude that a reasonable officer in the positions of Ciccone, Bradley or Benedetto would have been aware that their conduct could violate a person's Constitutional and statutory rights. See <u>Motto</u>, 1997 WL 816509 (D.N.J. August 27, 1997).  Ciccone admits that he was charged with demanding political contributions from governmental employees. (May 24, 2004, Ciccone Dep., Ex. I, Stone Aff., 33:19-25).  He further testified in his deposition that both Frank Bendetto and Michael Bradley were amongst the group of individuals under his command that were responsible for

20

the misconduct.  <u>Id.</u> 34:7-10.[5]

**B.    Exhaustion of Remedies**

Defendant Ciccone (adopting the County Defendants'
arguments) argues that Plaintiffs' overtime and compensatory time
claims should be dismissed because Plaintiffs' failed to exhaust
the remedies required under the Collective Bargaining Agreement
("CBA").  Ciccone Mem. at 15.  Although the Court rejects
Plaintiffs' arguments that they are not parties to the CBA
agreement and that administrative channels provided by the CBA
are inadequate, the Court finds that § 1983 and the FLSA do not
require Plaintiffs to exhaust their remedies under the CBA.
Plaintiffs state law claims, however, require Plaintiffs to
exhaust their remedies.

**1.    § 1983**

To exhaust their remedies under the CBA, Plaintiffs would be
required to submit to arbitration.  Plaintiffs argue–and
Defendants concede–that it is the "law of this Circuit that the
effectiveness of Section 1983 would be diluted if plaintiffs were
required to resolve such claims by binding arbitration."  Pls.
Mem. at 25 (citing <u>Hochman v. Board of Educ. of Newark</u>, 534 F.2d

---

[5]There also is additional proof that both Bendetto and
Bradley were supervisor's of certain departments in the Sheriff's
department and had the authority to cause transfers and make
decisions under Ciccone's tenure.  <u>See</u> <u>e.g.</u>,April 16, 2004,
Janiec Dep., Ex. C, Wurth Aff., 83:1-3("he, [Benedetto], was
really in charge –everybody reported to him in one way, shape or
form, he oversaw everything").

1094 (3d Cir. 1976; <u>Tripp v. Renaissance Advantage Charter Sch.</u>,
2003 U.S. Dist. LEXIS 19834, 31-32 (D. Pa., 2003)); see Ciccone
Reply Memorandum ("Ciccone Reply Mem.") at 10(relying on County
Defendants' Reply Memorandum ("Cty Def. Reply Mem.") at 19).
Therefore, Plaintiffs were not required to first exhaust their
remedies before pursuing their § 1983 action.

### 2.  Fair Labor Standards Act

The rule to determine whether a plaintiff is required to
exhaust remedies set forth in a CBA before bringing the claim in
federal court is well established.  If the claim is based on
rights arising from the CBA, the plaintiff is required to exhaust
remedies created by the agreement.  <u>Collins v. Lobdell</u>, 188 F.3d
1124 (9th Cir. 1999)(citing <u>Barrentine v. Arkansas-Best Freight
Sys.</u>, Inc., 450 U.S. 728 (1981).  If the claim arises from
statutory rights, the plaintiff is not required to exhaust
agreement remedies.  <u>Barrantine</u>, 450 U.S. at 737, because
statutory rights under the FLSA are "guarantees to individual
workers that may not be waived through collective bargaining."
<u>Local 246 Util. Workers Union v. Southern Cal. Edison Co.</u>, 83
F.3d 292, 297 (9th Cir. 1996).

Moreover, FLSA rights, which have been congressionally
granted, take precedence over conflicting provisions in a
collectively bargained compensation arrangement.  <u>Barrentine</u>, 450
U.S. at 741-41.  Consequently, exhaustion of remedies outlined in

22

a CBA is not required even where a claim based on statutory rights also presents a claim under the agreement. Collins, 188 F.3d at 1128.

Plaintiffs claim that Defendants violated the FLSA by denying Plaintiffs overtime, requiring them to work overtime without compensation and forcing them to take compensatory time off in lieu of overtime payments.[6] Compl. at ¶ 39. Under the FLSA, covered employers may not employ any employee "for a workweek longer than forty hours unless such employee receives compensation for his employment . . . at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). As Plaintiffs have shown that a genuine issue of material fact exists at least with regards to Defendants forcing Plaintiffs to work overtime without pay, Plaintiffs' FLSA claims are properly before the Court, and Plaintiffs were not required to exhaust the remedies provided by the CBA.

---

[6]If the Plaintiffs had argued that they sought to enforce provisions 10.8 and 10.13 of the CBA requiring that overtime be offered without favoritism and based on a seniority list, Plaintiffs would have been required to exhaust their remedies under the CBA. A claim based on these two provisions is contractual in nature, and no similar statutory right exists under the FLSA. The FLSA does, however, prohibit an employer from discharging "or in any other manner discriminat[ing]" against an employee who has filed a complaint or proceeding pursuant to her rights under the FLSA. 29 U.S.C. § 2615(a)(3). Plaintiffs do not contend that they were discriminated against by bringing this suit. Furthermore, as discussed above, Plaintiffs' claims that they were discriminated against for exercising their First Amendment rights are more appropriately brought under § 1983 and not the FLSA.

### 3. State Law Claims

Plaintiffs do not contend that their state law claims are excepted from the general rule requiring the exhaustion of remedies. Pls. Mem. at 24-25. Plaintiff claims that Defendants' alleged conduct constitutes violations of their employment rights under N.J.S.A. 11:1-1 et. seq., N.J.S.A. 40A:9-1 et. seq., and N.J.S.A. 40A:14-1 et. seq. Plaintiffs do not suggests that these statutes contain particular provisions regarding compensatory time and overtime. Unlike the FLSA, Plaintiffs' rights do not independently arise from these statutes, but is based on the agreement set forth in the CBA. Plaintiffs state law claims, therefore, are dismissed for failure to exhaust the remedies outlined in the CBA.

### C. Failure to Prove Damages

Plaintiffs seek compensatory damages, punitive damages and damages for emotional distress. Plaintiffs are entitled to compensatory damages that are proper to compensate Plaintiffs for injuries sustained as a direct result of Defendants' conduct. Plaintiffs have provided sufficient evidence that Defendants' alleged conduct resulted in a loss of pay through stipends, on call pay, use of county vehicles and differential ranks.

Plaintiffs also may receive punitive damages if they can show that Defendants' conduct is "motivated by evil motive or intent, or that it involves reckless or callous indifference to

24

others' federally protected rights." <u>Perez v. Cucci</u>, 725 F.Supp. 209 (D.N.J. 1989) (citing <u>Basista v. Weir</u>, 340 F.2d 74, 87-88 (3d Cir. 1965). There is ample evidence here to show that Defendants' alleged conduct could be considered reckless or callous. Therefore, Plaintiffs have adequately made a claim for punitive damages.

Plaintiffs' claims for damages for emotional distress, however, are unsupported by the evidence. Although Plaintiffs dropped their claims for intentional infliction of emotional distress, Plaintiffs claim that they, nevertheless, have provided "sufficient proof of both monetary and emotional distress damages to be permitted to proceed to trial." Pls. Mem. at 17. The Court disagrees. Plaintiffs' contentions of humiliation and physical distress, without more, are insufficient to sustain a claim for emotional distress. <u>Rocci v. MacDonald-Cartier</u>, 323 N.J. Super. 18, 25 (App. Div. 1999) (plaintiff's testimony that she was "upset" and "embarass[ed]" was inadequate to support a claim for emotional distress); <u>see also</u> <u>Buckley v. Trenton</u>, 11 N.J. 255, 366-67(1988)(damages for emotional distress must be "so severe that no reasonable man could be expected to endure it").

## V. CONCLUSION

For the reasons stated in this Opinion, this Court **grants** the motion for summary judgment of Bergen County and the Bergen County Sheriff's Department on all counts. The Count **grants** the

motion for summary judgment of Defendants Ciccone, Bendetto and Bradley on Count Three (Violation of Plaintiffs' Employment Rights under N.J.S.A. 11:1-1, N.J.S.A. 40A:9-1 and N.J.S.A. 40A:14-1) and **denies** the motion for summary judgment for Defendants Ciccone, Bendetto and Bradley on Count One (Violation of First and Fourteenth Amendment Rights, 42 U.S.C. § 1983), Count Four (Violation of Fair Labor Standards Act) and Count Five (Violation of the New Jersey Law Against Discrimination).  All other counts have been dismissed voluntarily by Plaintiffs.

An appropriate Order accompanies this Opinion.


     /s/ William G. Bassler
WILLIAM G. BASSLER, U.S.S.D.J.


Dated: December 29, 2005